[Cite as *In re Contempt of Mallory-Nichols*, 2023-Ohio-3982.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

IN RE CONTEMPT OF  CARL
MALLORY-NICHOLS

:

:

:

:

No. 112746

[Appeal by Carl Mallory-Nichols in the
matter styled *In Re M.S.*]

JOURNAL ENTRY AND OPINION

**JUDGMENT:** VACATED
**RELEASED AND JOURNALIZED:** November 2, 2023

Civil Appeal from the Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. AD-21-902787

*Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting
Attorney, and Jake A. Elliott, Assistant Prosecuting
Attorney, *for appellant*.

MARY J. BOYLE, J.:

{¶ 1} Appellant-Carl Mallory-Nichols ("Mallory-Nichols"), appeals the trial court's judgment finding him in contempt, raising the following single assignment of error for review:

**Assignment of Error:** The trial court erred in denying the motion to set aside the magistrate's order.

{¶ 2} For the reasons set forth below, we vacate the contempt finding and the fine.

## I. Facts and Procedural History

{¶ 3} This appeal involves an underlying juvenile case where a magistrate found Cuyahoga County Division of Children and Family Services ("CCDCFS") case worker Mallory-Nichols in contempt of court for allowing Mother two unsupervised visits with the minor child, who was at a behavioral hospital in Youngstown, Ohio at the time.

{¶ 4} In September 2022, the magistrate in the juvenile case held a hearing upon the annual review of the child's temporary custody. The magistrate ordered that temporary custody was to continue "in effect until April 7, 2023." (Journal Entry, 09/15/22.) The magistrate also lifted the prior no-contact order and permitted Mother to "have supervised contact with the child" who was residing at a children's behavioral hospital in Youngstown, Ohio. (Journal Entry, 09/15/22.)

{¶ 5} In December 2022, the matter came before the magistrate on the child's attorney's motion to withdraw as counsel. Counsel requested to withdraw after learning that the court's orders were not being followed. At that attorney conference, the magistrate learned that Mother had two unsupervised visits with the child — one day pass for 8 hours and another pass for 12 hours. Mother's counsel indicated that he was aware of one of the visits but did not disclose the violation to

the court, citing to attorney-client privilege. CCDCFS counsel acknowledged that he was aware of the visits but did not disclose the violation, opining that the behavioral hospital granted the visits. The magistrate found these visits to be a violation of a direct order of the court and set a hearing to show cause why Mother, Mallory-Nichols, or CCDCFS should not be held in direct contempt of court for violating the court's orders.

{¶ 6} At the hearing in January 2023, the testimony was undisputed that Mother and child had two unsupervised visits in late November 2022 and that Mallory-Nichols gave the go ahead to the hospital for those visits to occur. Charlene Milano ("Milano"), the residential unit director at the hospital, testified that on November 16, 2022, the hospital case manager emailed Mallory-Nichols after speaking with the therapist, who recommended the passes, and asked if there could be a six-hour pass for the weekend. The next day, Mallory-Nichols "responded that that was perfect." (01/17/23, tr. 14.) Then on November 18, 2022, Mallory-Nichols provided verbal consent to the second pass via Zoom. Milano further testified that on November 29, 2022, Mallory-Nichols contacted them, advising to not issue the day passes. Milano stated that the visits with Mother were "good for [the child]" and that the child was "more motivat[ed] for treatment when she returned." (01/17/23, tr. 19.)

{¶ 7} Corey Carlo ("Carlo"), Mallory-Nichols's supervisor, testified that he became aware of the unsupervised visits on November 29, 2022. Carlo testified that he spoke to Mallory-Nichols after the error was discovered and learned that the

visits were the result of "a less than thorough reading of a journal entry." (01/17/23, tr. 30.) He stated that "there was no intention to violate any type of Court orders." (01/17/23, tr. 30.) Carlo believed that "it was an oversight, * * * once all the parties were clear, the visits ceased, they stopped." (01/17/23, tr. 34.)

**{¶ 8}** Mallory-Nichols testified that he has been assigned to this case since May 2022 and was present for the September 2022 hearing. He testified that he authorized the visits and that he "made a mistake on [his] end of not having carefully read the journal entry from the Court." (01/17/23, tr. 37.) He learned that the visits should not have taken place when he was notified by CCDCFS counsel on November 29, 2022. Once he realized that he made a mistake, he notified the hospital case manager and the child's guardian ad litem of his mistake — he "had authorized a pass and that the visits were in fact supposed to be supervised and that moving forward all further visits needed to be supervised from then forward." (01/17/23, tr. 38.) When asked if he intended to violate the court's September 14, 2022 order, Mallory-Nichols stated, "Absolutely not." (01/17/23, tr. 38.)

**{¶ 9}** Mallory-Nichols further testified that he did recall the court lifting the no-contact order at the September 2022 hearing. Mallory-Nichols acknowledged that he understood that part of the court order, but did not read the whole sentence. He testified, "From my thought process at that time I think I got ahead of myself thinking about what the next steps would be for the case with the no-contact order being lifted. I made the mistake of not listening carefully enough to the rest of the

order. * * * I didn't thoroughly read [the journal entry] enough." (01/17/23, tr. 41-42.)

{¶ 10} After the hearing, the Mallory-Nichols submitted a post-hearing brief, arguing that the unsupervised visits were an oversight and he did not intend to violate the court's order. Once he realized this error, he notified the hospital and no further unsupervised visits occurred. Mallory-Nichols further argued that the sanction was criminal in nature. In March 2023, the magistrate found Mallory-Nichols in "[c]ivil indirect contempt" of the court's September 15, 2022 order, stating that Mallory-Nichols failed to show a "lack of knowledge of the order" because he was present at the hearing and received a copy of the order. The magistrate also found that Mallory-Nichols's testimony that he "got ahead of himself" was contrary to his contention that he did not have knowledge of the supervision requirement. The magistrate sentenced Mallory-Nichols to a $50 fine that would be purged if Mallory-Nichols "adher[ed] to all court orders without violation in the instant case [with] a review to be held in six months to determine compliance." (Journal Entry, 03/08/23.)

{¶ 11} In response, Mallory-Nichols filed a motion to set aside the magistrate's order, arguing that the magistrate improperly found him in indirect civil contempt because the fine imposed constituted punishment for allowing the unsupervised visits to occur, which made the contempt finding criminal and not civil. The trial court denied Mallory-Nichols's motion, stating that the "[m]otion is not well taken." Mallory-Nichols now appeals the court's order.

## II. Law and Analysis

{¶ 12} The question at the crux of this appeal is whether the magistrate's contempt finding was civil or criminal. Mallory-Nichols argument is three-fold. He argues that (1) the magistrate incorrectly characterized her contempt finding as an indirect civil contempt; (2) a purge condition regulating future conduct is defective as a matter of law; and (3) there was no evidence in the record to support a finding that he intended to violate the court's order.

{¶ 13} Generally, when analyzing the propriety of a contempt proceedings, the contempt must be reviewed on two levels. *State v. Kilbane*, 61 Ohio St.2d 201, 203, 400 N.E.2d 386 (1980), citing *Cincinnati v. Cincinnati Dist. Council 51*, 35 Ohio St.2d 197, 202, 299 N.E.2d 686 (1973). "First, [the] conduct must be examined to see if it constituted a direct or indirect contempt. Second, the trial court's treatment of this matter must be analyzed to ascertain whether [the conduct] was dealt with under that court's civil or criminal contempt powers." *Id.*; *see also Cleveland v. Bright*, 2020-Ohio-5180, 162 N.E.3d 153, ¶ 19 (8th Dist.), citing *Kilbane*.

### A. Criminal Versus Civil Contempt

{¶ 14} We begin our discussion with criminal and civil contempts. The Ohio Supreme Court has explained:

> Although there has never been a clear line of demarcation between criminal and civil contempts, it is usually said that offenses against the dignity or process of the court are criminal contempts, whereas violations which are on their surface offenses against the party for whose benefit the order was made are civil contempts.

*State v. Local Union 5760, United Steelworkers of Am.*, 172 Ohio St. 75, 82, 173 N.E.2d 331 (1961), *overruled on other grounds*, *Brown v. Executive 200, Inc.*, 64 Ohio St.2d 250, 416 N.E.2d 610 (1980), citing *O'Brien v. People, ex rel.*, 216 Ill. 354, 368, 75 N.E. 108 (1905).

{¶ 15} "The distinction is usually based on the purpose to be served by the sanction." *State ex rel. Corn v. Russo*, 90 Ohio St.3d 551, 554, 740 N.E.2d 265 (2001), citing Dan D. Dobbs, Contempt of Court: A Survey, 56 Cornell L.Rev. 183, 235 (1971). "Thus, in determining whether a contempt is civil or criminal, the pertinent test is 'what does the court primarily seek to accomplish by imposing sentence?'" *Id.* at 554-555, quoting *Shillitani v. United States*, 384 U.S. 364, 370, 86 S.Ct. 1531, 16 L.Ed. 2d 622 (1966).

{¶ 16} Criminal contempt sentences are "punitive in nature and are designed to vindicate the authority of the court." *Local Union* at 82-83, citing *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 31 S.Ct. 492, 55 L.Ed. 797 (1911); *United States v. United Mine Workers of Am.*, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947). Whereas, civil sanctions are designed for remedial or coercive purposes and are often employed to compel obedience to a court order. *Russo* at 555, citing *Shillitani*. Civil contempts can be characterized as violations against the party for whose benefit the order was made, whereas criminal contempts are most often described as offenses against the dignity or process of the court. *Id.*, citing *Kilbane*, 61 Ohio St.2d 201, 400 N.E.2d 386.

{¶ 17} In *Kilbane*, the Ohio Supreme Court explained that "[t]he most important consequences arising from this classification of contempts is that many of the significant constitutional safeguards required in criminal trials are also required in criminal contempt proceedings." *Id.* at 205, citing Dobbs, Contempt of Court: A Survey, 56 Cornell L.Rev. 183, at pages 241-242. "Specifically, this includes 'the right to notice of the charges, the right to defend oneself and be heard, the right to counsel, and the right that there be proof beyond a reasonable doubt to support a conviction.'" *Bright*, 2020-Ohio-5180, 162 N.E.3d 153, at ¶ 23 quoting *Internatl. Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 826, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994).

{¶ 18} In contrast, the standard of proof for civil contempt is clear and convincing evidence. *Bright* at ¶ 24, citing *Carroll v. Detty*, 113 Ohio App.3d 708, 681 N.E.2d 1383 (4th Dist.1996). An alleged contemnor is entitled only to those rights afforded in a civil action and any sanction imposed for civil contempt must afford the contemnor the right to purge himself of the contempt. *Id.* at ¶ 24, *Schrader v. Huff*, 8 Ohio App.3d 111, 456 N.E.2d 587, ¶ 21 (9th Dist.1983), citing *DeLawder v. Dodson*, 4th Dist. Lawrence No. 02CA27, 2003-Ohio-2092.

### B. Direct Versus Indirect Contempt

{¶ 19} To determine the propriety of the contempt procedure and sanction, reviewing courts must also determine if the contempt was direct or indirect. *Kilbane*, 61 Ohio St.2d at 204, 400 N.E.2d 386.

{¶ 20} "The fundamental distinction between direct contempt and indirect contempt lies in the location of the act of contempt — whether it takes place within the presence of the judge, or elsewhere." *Bright* at ¶ 26. "A direct contempt is one committed in the presence of or so near the court as to obstruct the due and orderly administration of justice." *In re Lands*, 146 Ohio St. 589, 595, 67 N.E.2d 433 (1946). "It is said that direct contempt takes place in the presence of the court, and indirect contempt is all other contempt." *Cincinnati*, 35 Ohio St.2d at 202, 299 N.E.2d 686.

{¶ 21} Courts have the inherent power in direct contempt proceedings to summarily punish a contemnor. *Bright*, 2020-Ohio-5180, 162 N.E.3d 153 at ¶ 27, citing *Zakany v. Zakany*, 9 Ohio St.3d 192, 459 N.E.2d 870 (1984), syllabus. "This is because '[w]hen a judge has viewed and/or heard such misbehavior, he or she is said to have personal knowledge of the contemptible actions.'" *Id.*, quoting *Warren v. DeMarco*, 11th Dist. Trumbull No. 2003-T-0052, 2004-Ohio-3191, ¶ 14, citing *In re Neff*, 20 Ohio App.2d 213, 222, 254 N.E.2d 25 (5th Dist.1969). To summarily punish means "the court is not required to accord the person the usual procedural rights of due process, such as the filing of process or the taking of evidence." *Quirke v. Quirke*, 11th Dist. Ashtabula No. 92-A-1755, 1996 Ohio App. LEXIS 4110, 6-7 (Sept. 20, 1996), citing *Fed. Land Bank Assn. v. Walton*, 99 Ohio App.3d 729, 651 N.E.2d 1048 (3d Dist.1995). Due process protections are necessary, however, if "the punishment imposed is of such severity as to classify the contempt as a serious offense rather than a petty offense." *In re Neff* at 226, citing *Bloom v. Illinois*, 391 U.S. 194, 88 S.Ct. 1477, 20 L.Ed.2d 522 (1968).

### C. Mallory-Nichols's Contempt

{¶ 22} With the above principles in mind, we now must determine whether Mallory-Nichols's contempt was direct or indirect, and whether it was civil or criminal. In doing so, we are mindful that, as the reviewing court, we must look to the entire record to determine the purpose of the sanction. *Kilbane*, 61 Ohio St.2d at 206, 400 N.E.2d 386. In the instant case, there is no dispute that the unsupervised visits took place outside the presence of the court, and as a result, the "indirect" finding by the court is not at issue. Our focus, rather, is on determining whether the contempt finding was civil or criminal. We must ask what did the court primarily seek to accomplish by imposing this sanction: was it to coerce Mallory-Nichols to obey the judgment or was it to punish him for past violations? *Brown*, 64 Ohio St.2d at 254, 416 N.E.2d 610. The Ohio Supreme Court has stated that

> Punishment is remedial or coercive and for the benefit of the complainant in civil contempt. Prison sentences are conditional. The contemnor is said to carry the keys of his prison in his own pocket, * * * since he will be freed if he agrees to do as ordered. Criminal contempt, on the other hand, is usually characterized by an unconditional prison sentence. Such imprisonment operates not as a remedy coercive in its nature but as punishment for the completed act of disobedience, and to vindicate the authority of the law and the court. * * *

*Id.* at 253-255.

{¶ 23} In the instant case, it is clear the Mallory-Nichols "didn't thoroughly read [the journal entry] enough" and approved the unsupervised visits in contravention to the court's supervised contact order. (01/17/23, tr. 42.) The magistrate found Mallory-Nichols failed to show a "lack of knowledge of the order"

because he was present at the hearing and received a copy of the order and sentenced Mallory-Nichols to a $50 fine that would be purged if Mallory-Nichols "adher[ed] to all court orders without violation in the instant case [with] a review to be held in six months to determine compliance." (Journal Entry, 03/08/23.) We find that this sanction operates, not as a remedy coercive in its nature and for the benefit of the complainant, but as punishment for Mallory-Nichols's act of disobedience.

{¶ 24} Mallory-Nichols approved Mother's two unsupervised visits, which cannot not be undone. Mallory-Nichols's $50 fine would be purged if he "adher[ed] to all court orders without violation * * * [with] a review to be held in six months to determine compliance." (Journal Entry, 03/08/23.) With this sanction, the court did not ask Mallory-Nichols to do something he had refused to do. Mallory-Nichols did not have the ability to impact any of his sentence by obedience; only by further violation could his sentence be reinstated. He was not afforded the opportunity to purge himself of the contempt, which indicates that his sentence was intended to be punitive. The court intended to punish Mallory-Nichols for his failure to comply with the court's supervised visit order, not compel his immediate compliance; thus, the finding of contempt was criminal in nature, not civil.

{¶ 25} Mallory-Nichols argues that *In re D.S.S.*, 11th Dist. Portage No. 2020-P-0039, 2020-Ohio-5386, is analogous to the instant case. We agree.

{¶ 26} In *In re D.S.S.*, the juvenile court found an employee of a counseling service in contempt for failing to appear after being subpoenaed to testify. The employee was sentenced to ten days in jail and fined $250. The entire jail sentence

and $225 of the fine were suspended on the condition that the employee "obey all court subpoenas issued in Portage County for one year." *Id.* at ¶ 3. The Eleventh District Court of Appeals held that the juvenile court erred by finding the employee in contempt. *Id.* at ¶ 20. The *In re D.D.S.* Court found that the juvenile court intended to punish the employee for failing to comply with the subpoena because the "purge condition" did not "ask[ ] her to do something she refused to do. She did not have the ability to impact any of her sentence by obedience; only by further violation could her sentence be reinstated." *Id.* at ¶ 15. As a result, the court's contempt finding was an indirect criminal contempt, not civil. *Id.* at ¶ 17. The *In re D.D.S.* Court further found that because the juvenile court made no finding of guilt beyond a reasonable doubt, and did not address the element of intent, the court erred in finding the employee in indirect criminal contempt. *Id.* at ¶ 20.

{¶ 27} Similarly, the juvenile court in this matter did not find that Mallory-Nichols was guilty beyond a reasonable doubt. And, like *In re D.S.S.*, the testimony at the hearing and the totality of the circumstances do not demonstrate that Mallory-Nichols intended to violate the court's order when permitting the unsupervised visits.

{¶ 28} "[T]he standard of proof required in criminal contempt proceedings is proof of guilt beyond a reasonable doubt and a contemnor cannot be given a criminal contempt sanction unless proven guilty beyond a reasonable doubt." *Brown*, 64 Ohio St.2d at 252, 416 N.E.2d 610; *Bright*, 2020-Ohio-5180, 162 N.E.3d 153 at ¶ 23, citing *Internatl. Union*, 512 U.S. at 826, 114 S.Ct. 2552, 129 L.Ed.2d 642.

Additionally, in cases of indirect criminal contempt, "it must be shown that the alleged contemnor intended to defy the court." *Midland Steel Prods. Co. v. Internatl. Union, United Auto., Aero. & Agricultural Implement Workers, Local 486*, 61 Ohio St.3d 121, 127, 573 N.E.2d 98 (1991), citing *Rowe v. Std. Drug Co.*, 132 Ohio St. 629, 9 N.E.2d 609 (1937). When reviewing a trial court's finding of indirect criminal contempt, an appellate court ""must determine whether sufficient evidence existed for the trial court to reasonably conclude beyond a reasonable doubt that the contemnor purposely, willfully, or intentionally violated a prior court order."" *In re D.S.S.* at ¶ 19, quoting *Weisgarber v. Weisgarber*, 5th Dist. Stark No. 2015CA00158, 2016-Ohio-676, quoting *In re West*, 5th Dist. Knox No. 14CA22, 2015-Ohio-1501.

{¶ 29} Here, no testimony or evidence was presented to show that Mallory-Nichols acted intentionally. Rather, Mallory-Nichols testified that he did not intend to violate the court's September 14, 2022 order. He recalled the court lifting the no-contact order at the September 2022 hearing and acknowledged that he understood that part of the court order. He did not read the whole sentence, however. He testified, "From my thought process at that time I think I got ahead of myself thinking about what the next steps would be for the case with the no-contact order being lifted. I made the mistake of not listening carefully enough to the rest of the order. * * * I didn't thoroughly read [the journal entry] enough." (01/17/23, tr. 41-42.) Accordingly, we find that the court erred in finding Mallory-Nichols guilty of contempt.

{¶ 30} The sole assignment of error is sustained.

## III. Conclusion

{¶ 31} After reviewing the entire record, we find that the juvenile court erred in finding Mallory-Nichols guilty of contempt. Mallory-Nichols was not afforded the opportunity to purge himself of the contempt, which indicates his sentence was intended to be punitive. The court intended to punish Mallory-Nichols for his failure to comply with the court's order, not compel his immediate compliance. Thus, we find that the court's contempt sanction was criminal in nature, not civil. With criminal contempt, a contemnor cannot be given a criminal contempt sanction unless proven guilty beyond a reasonable doubt and it must be shown that the contemnor intended to violate the court's orders. Here, the court did not find that Mallory-Nichols was guilty beyond a reasonable doubt and the testimony at the hearing and the totality of the circumstances do not demonstrate that Mallory-Nichols intended to violate the court's order when he permitted the unsupervised visits.

{¶ 32} Therefore, the judgment is vacated.

Costs waived.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court, juvenile division, to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27

of the Rules of Appellate Procedure.


_____
MARY J. BOYLE, JUDGE

MARY EILEEN KILBANE, P.J., and
MICHAEL JOHN RYAN, J., CONCUR